# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| SETH ROGERS, individually and as<br>father and next friend of S.W.D.R, a Minor, | ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| *v.* | ) ) ) | Case No. 3:26-cv-981 |
| DEPARTMENT OF CHILDREN'S SERVICES,<br>a Tennessee state agency;<br>MARGIE QUIN, in her official capacity<br>Commissioner of the Tennessee Department of<br>Children's Services and in her individual capacity;<br>LESLEY KEELE RITCHIE,<br>in her individual capacity;<br>LAURA BOSWELL, in her individual capacity;<br>AMIRA J. WALKER, in her individual capacity;<br>and DOES 1–15, | ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) | |

## FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## DEMAND FOR JURY TRIAL

### PRELIMINARY STATEMENT

1. This civil rights action arises from the Tennessee Department of Children's Services ("DCS")'s failure to protect S.W.D.R. ("Minor Child"), a fifteen-year-old child with Autism Spectrum Disorder, Severe Combined Type ADHD, and 6Q 27 Chromosome Deletion Syndrome, who vanished from his mother and stepfather's home in Hendersonville, Tennessee on February 26, 2024.

2. S.W.D.R. is not an ordinary missing child. He is a profoundly vulnerable minor with multiple documented disabilities, a history of sexual abuse that had been reported to and investigated

by the Tennessee DCS, and a home life that DCS's own records show was marked by physical abuse, emotional degradation, and a stepfather whom neighbors reported "hated the child and wanted the child to die." DCS had formally determined that S.W.D.R. was "at serious or imminent risk of removal from their home."

3. DCS investigated S.W.D.R.'s household on two separate occasions based on allegations of sexual and physical abuse. On both occasions, DCS closed its cases finding "no concerns" and "no services needed," despite documenting alarming evidence that S.W.D.R. was living in a dangerous and abusive environment.

4. Approximately nine (9) months after DCS closed its second case, concluding "no services needed," S.W.D.R. disappeared. He has never been found. DCS's own records establish that it knew this child was in danger, documented that danger in meticulous detail, formally determined he was at imminent risk of removal, and then did nothing. This inaction constitutes deliberate indifference to S.W.D.R.'s constitutional rights and directly contributed to the circumstances of his disappearance.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

6. Supplemental jurisdiction over state-law claims exists under 28 U.S.C. § 1367.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this District is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## PARTIES

8. Plaintiff, Seth Rogers ("ROGERS"), is S.W.D.R.'s biological father. He resides in Clarksville, Tennessee. He brings this action individually and as father and next friend of S.W.D.R.

2

9. Defendant Tennessee Department of Children's Services ("DCS") is a state agency of the State of Tennessee, established pursuant to Tenn. Code Ann. § 37-5-101 *et seq.*, and is responsible for administering child welfare services throughout the State, including the investigation of reports of child abuse and neglect, the placement and supervision of children in foster care, and the provision of services to children and families. DCS maintains its principal office at 505 Deaderick Street, Nashville, Tennessee 37243, and operates through regional offices and caseworkers across the State of Tennessee. At all times relevant to this action, DCS acted under color of state law and through its agents, employees, and representatives, who were acting within the scope of their employment and authority.

10. Defendant Margie Quin ("QUIN") is the Commissioner of the Tennessee Department of Children's Services. She is sued in her official capacity for prospective injunctive and in her individual capacity for damages to the extent she personally participated in establishing or maintaining the policies, customs, and practices that caused the constitutional violations alleged herein.

11. Defendant Lesley Keele Ritchie ("RITCHIE") was at all relevant times a Team Leader at DCS, Mid Cumberland Region. RITCHIE conducted the administrative review on the physical abuse investigation (Case ID 1509540657) and closed that case as "No Services Needed." She also participated in the 2022 sexual abuse investigation (Case ID 1488410703), which provided her with actual knowledge of S.W.D.R.'s history and vulnerabilities. She is sued in her individual capacity.

12. Defendant Laura Boswell ("BOSWELL") was at all relevant times a Case Manager at DCS, Mid Cumberland Region. BOSWELL conducted the face-to-face interviews with S.W.D.R., the Proudfoot family, and Seth Rogers on both the 2022 sexual abuse investigation and the 2023 physical abuse investigation. She personally documented S.W.D.R.'s disclosures of

3

fear, abuse, and trauma. In the 2023 physical abuse investigation, she failed to interview ROGERS as S.W.D.R.'s other legal parent with joint physical and legal custody, and participated in the decision to close that case as "No Services Needed" without protective action. She is sued in her individual capacity.

13. Defendant Amira J. Walker ("WALKER") was at all relevant times a Supervisor at DCS, Mid Cumberland Region. WALKER approved the closure of Case ID 1488410703 as "Administrative Closure" on November 15, 2022. She is sued in her individual capacity.

14. Defendants DOES 1–15 are DCS employees, supervisors, and officials whose identities are presently unknown, but who participated in the investigation, supervision, and closure of the DCS cases involving S.W.D.R., and/or who established, maintained, or ratified the policies and practices that led to the constitutional violations alleged herein. Plaintiffs will amend this Complaint to identify these Defendants when their identities are ascertained.

## FACTUAL ALLEGATIONS

### A.  S.W.D.R.'s History of Abuse and Vulnerability Were Known to DCS

15. S.W.D.R. ("Minor Child") was born to Seth Rogers and Katie Proudfoot ("Katie") (née Rogers). His parents separated, and Katie married Christopher Proudfoot ("Proudfoot"). S.W.D.R. lived primarily with his mother and stepfather.

16. S.W.D.R. was diagnosed with Autism Spectrum Disorder, Severe Combined Type ADHD, and 6Q 27 Chromosome Deletion Syndrome. He had an Individualized Education Plan ("IEP") and a Section 504 Plan requiring his school to provide him with accommodations because he was a student with disabilities. S.W.D.R. was in the behavioral program at his school, received therapy three (3) times per week through Mental Health Cooperative, was on Concerta, saw a neurologist at Vanderbilt, and was scheduled to begin ABA therapy at the time of his disappearance. His therapist reported that, as a consequence of prior sexual abuse,

4

S.W.D.R. was "sexually aggressive" and suffered "frequent bathroom accidents." Law enforcement reported that S.W.D.R. had "some homicidal thoughts."

17. S.W.D.R.'s multiple disabilities made him uniquely vulnerable to abuse, neglect, and exploitation, and required DCS to exercise heightened care and to provide reasonable accommodations under the Americans with Disabilities Act when assessing his safety and needs.

**B. DCS Case ID 1488410703: Sexual Abuse Investigation (September–November 2022)**

18. On or about September 28, 2022, at approximately 6:33 p.m., a call was placed to the DCS Child Abuse Hotline. The intake was screened as a Priority 3 with allegations of sexual abuse against an unknown perpetrator. The alleged child victim was S.W.D.R.

19. The intake reported that on September 28, 2022, S.W.D.R. disclosed to a school professional that two (2) years earlier, while living in California with his mother, he experienced sexual abuse by another child ("Child B"). Specifically, S.W.D.R. disclosed that Child B "would make S.W.D.R. put his mouth on Child B's penis, and both he and the Child B would put their penises in each other's butts." S.W.D.R. stated he was "forced to do this by Child B" and that it occurred in the upstairs of his home in California and happened several times.

20. S.W.D.R. reported that Child B was his "only friend" and that Child B threatened that if S.W.D.R. didn't perform the sexual acts, or if he told anyone, they would not be friends anymore. S.W.D.R. reported that the abuse occurred when he was "10 or 12" and happened several times over weeks.

21. S.W.D.R. told the school professional that after he told her, she was the "only adult who knew besides my mom."

22. The intake further documented that S.W.D.R. stated he was disgusted with himself about what happened and that it had gotten much more difficult to pretend like it did not happen.

5

The intake noted that S.W.D.R. struggled with behaviors after he moved to the Sumner County School District and was placed in the behavior program at Shaffer Middle School.

23. Critically, the intake documented that S.W.D.R. "stated that he is afraid of what his stepfather 'Mr. Chris' (Chris Proudfoot) would do if he found out, and that he is afraid he will get 'hurt' for telling an adult what happened." The intake further noted that "stepfather has used corporal punishment on S.W.D.R. several times before, and it is unknown if he knows about the abuse, or how he will react or blame S.W.D.R."

24. The intake also noted that S.W.D.R. suffered from frequent bathroom accidents and displayed some verbal sexually aggressive behavior towards multiple other students.

25. On September 29, 2022, RITCHIE conducted an administrative review. She documented the sexual abuse allegations and noted the next steps would include a full assessment. Initial face-to-face response was due by October 3, 2022.

26. On September 30, 2022, BOSWELL met with S.W.D.R. at Shaffer Middle School in a private conference room. S.W.D.R. told BOSWELL that he "feels safe with his family at home" and that he "feels safe at dad's home." S.W.D.R. identified his father as Seth Rogers, who lived in Clarksville. S.W.D.R. stated something happened when he lived in California, but he did not want to talk about it at school. BOSWELL noted S.W.D.R. had "no visible marks or bruises and appears happy and healthy at this time."

27. On October 12, 2022, BOSWELL mailed a certified letter to the family, noting they had recently moved and there was no forwarding address.

28. On October 17, 2022, RITCHIE conducted another administrative review and updated the case, noting the BOSWELL had seen the child, that he "did not want to talk about what happened in CA," that the family was moving, and that efforts to contact them had been unsuccessful.

6

29. On October 27, 2022, BOSWELL conducted a home visit. Katie stated she "does not understand why this keeps getting called into DCS" and that the abuse "happened when S.W.D.R. was 8 and another child named Jonathan was involved." She stated "CPS and Detectives were involved in El-Cajon city" in California. She provided the California address: 9860 Dale Ave, Apt E5, Spring Valley, CA. She confirmed S.W.D.R. had "Severe Combined type ADHD" and "6Q 27 Chromosome Deletion," took Concerta, had an IEP and Behavioral Plan, and was starting therapy with Vanderbilt Psychiatry on November 3rd. She confirmed that S.W.D.R. also saw a Neurologist at Vanderbilt.

30. During the same visit, BOSWELL spoke to Proudfoot in private. Proudfoot stated, "this was all investigated in CA" and that he had "never spanked S.W.D.R. so he does not know why S.W.D.R. feels he would be mad for talking about what happened in CA." This statement was directly contradicted by S.W.D.R.'s own disclosure that he was "afraid" of what his stepfather would do, and by the intake noting the stepfather had used "corporal punishment on S.W.D.R. several times before." DCS did not reconcile this contradiction.

31. BOSWELL then met with S.W.D.R. in private, noting he was "completing his homework" and "appeared happy and healthy."

32. On November 1, 2022, BOSWELL verified that the sexual abuse case in California had been investigated by Detective Gloria Mendoza in El Cajon. She also verified mental health services and Vanderbilt appointments for S.W.D.R.

33. On November 3, 2022, the case was presented to the Sumner County Child Protective Investigative Team ("CPIT"), which included Juvenile Court, Ashley's Place Child Advocacy Center, Assistant District Attorney Jenni Smith, and law enforcement. A detective was assigned to the case. All members agreed to classify the case as "Administrative Closure."

34. On November 7, 2022, RITCHIE updated her review, noting: "The case has now been presented to CPIT as administrative closure as it was investigated in CA. This was child on child and they were the same age. The child reports no concerns at this time. The child is getting back in therapy services. The child reports no concerns. The mother is protective and proactive with the child."

35. On November 14, 2022, RITCHIE spoke with CAC Director Amy Salyers, and the classification was changed to "Unable to Complete" based on policy 14.7, because the incident occurred out of state.

36. On November 15, 2022, Supervisor WALKER completed the final administrative review and approved the case for closure as "Unable to Complete due to the incident occurring out of state." The case was closed.

37. The foregoing investigation gave DCS and law enforcement actual knowledge of S.W.D.R.'s vulnerability. By reason of this actual knowledge, DCS and law enforcement were on heightened notice that any subsequent allegation of abuse by Proudfoot or within the Proudfoot household required a more searching and skeptical investigation than they would otherwise apply. The first investigation's findings were not a clean slate. They were a documented predicate of danger that obligated DCS to treat any future report concerning this child and this household with the gravity the circumstances demanded.

**C. DCS Case ID 1509540657: Physical Abuse Investigation (May 2023)**

38. On May 3, 2023, at approximately 9:06 p.m., a second call was placed to the DCS Child Abuse Hotline. This intake was screened as a Priority 3 with allegations of physical abuse against Proudfoot. The alleged child victim was S.W.D.R.

39. The intake reported that Proudfoot had made "comments about pushing the child against a wall when he does not behave" and that the child reported Proudfoot hit S.W.D.R. in the belly.

40. On May 8, 2023, at approximately 6:30 p.m., BOSWELL arrived at the family home. Proudfoot granted permission to enter. BOSWELL met with S.W.D.R. on the porch. S.W.D.R. stated he remembered BOSWELL coming to his home last year.

41. During this interview, S.W.D.R. told BOSWELL that Proudfoot required he wore a belt everyday. S.W.D.R. stated that Proudfoot asked him to lift his shirt, and when S.W.D.R. did not have a belt on, Proudfoot "smacked him in his belly with the back of his hand and said you know you are supposed to wear a belt."

42. S.W.D.R. also told BOSWELL that he had been lying to Katie and Proudfoot about brushing his teeth and making his bed, and that he had been "getting into trouble for lying."

43. BOSWELL then met with Proudfoot on the porch. Proudfoot admitted that he was cleaning S.W.D.R.'s drawers, asked S.W.D.R. if he had a belt on, and when S.W.D.R. pulled up his shirt and said no, Proudfoot "whacked him with the back of his hand in his belly and said boy you know you are suppose to wear a belt everyday." Proudfoot stated S.W.D.R. had to wear a belt because he needed to start wearing pull ups. Proudfoot claimed he had "never physically harmed S.W.D.R."

44. Proudfoot's own admission that he "whacked" a child with diagnosed autism and multiple disabilities in the belly constituted physical abuse. His requirement that S.W.D.R. "wear a pull up" and submit to shirt-lifting inspections constituted degrading and humiliating treatment of a disabled child who suffered from documented bathroom accidents as a consequence of prior sexual trauma.

45. BOSWELL spoke to Katie in the kitchen. Katie stated, "they have been working with S.W.D.R. on when he tells something to tell the entire story" and that "S.W.D.R. will tell bits and pieces to a story to fit his narrative." She stated she had "no concerns that Mr. Proudfoot smacked S.W.D.R.'s belly with intent to hurt him."

46. On May 9, 2023, BOSWELL verified that S.W.D.R. was receiving therapy services three times per week through a private therapist and medication management through Mental Health Cooperative.

47. On May 11, 2023, RITCHIE conducted the administrative review and concluded: "This case is ready for closure at this time as [No Services Needed]. [Case Manager] has met with the family, and they denied any concerns. The child reported being safe in the home. He stated the stepfather popped his belly and told him to wear a belt. The child denied any physical abuse in the home. The stepfather reported the same as the child." RITCHIE noted the "FAST is completed with no need for intervention."

48. On May 11, 2023, the case was closed as "No Services Needed."

49. DCS's failure to conduct a minimally adequate investigation was compounded by its complete failure to involve ROGERS, S.W.D.R.'s biological father, who held joint physical and legal custody of S.W.D.R. pursuant to a court order. Despite this, DCS never notified ROGERS that the investigation was underway, never interviewed him as S.W.D.R.'s other legal parent to obtain his observations regarding Proudfoot or the conditions in the Proudfoot home, and never offered to place S.W.D.R. with him during the investigation, notwithstanding that such placement was clearly within DCS's authority and was the most obvious protective measure available.

50. Had DCS fulfilled this most basic obligation, it would have learned critical information that was never captured in the case file. ROGERS would have told DCS investigators that

S.W.D.R. had expressed to him on multiple occasions that he was more comfortable with ROGERS than with Proudfoot, and that S.W.D.R. was afraid of Proudfoot because he believed Proudfoot would hurt him if he disclosed what had been happening. ROGERS would have informed DCS that Proudfoot had ridiculed S.W.D.R. about the prior sexual assault, compounding S.W.D.R.'s existing trauma and making S.W.D.R. even less likely to disclose abuse to any adult he believed would report back to the Proudfoot household.

51. ROGERS would further have told DCS that Katie had spoken to him on multiple occasions in terms that evidenced her frustration with and hostility toward S.W.D.R., telling ROGERS repeatedly how fed up she was with S.W.D.R. for his ongoing incidents of soiling and wetting himself—the very same bathroom accidents that S.W.D.R.'s therapist had documented as a known consequence of his prior sexual trauma.

52. ROGERS would have advised DCS that S.W.D.R.'s mental state had been deteriorating, that his behavioral problems were worsening, and that S.W.D.R. himself appeared increasingly distressed in the period leading up to the investigation. DCS already possessed documentation of S.W.D.R.'s escalating behavioral issues. A minimally competent investigator would have recognized S.W.D.R.'s worsening condition not as a fixed background fact, but as a contemporaneous warning sign that something in S.W.D.R.'s living environment was causing him active harm.

53. DCS did not investigate the cause of S.W.D.R.'s deterioration. It closed the case instead.

**D. S.W.D.R.'s Disappearance**

54. On February 26, 2024, Katie reported that S.W.D.R. "left the home on his own and his whereabouts are unknown" and that "S.W.D.R. has never left the home before alone." Given S.W.D.R.'s neurodivergence, his developmental disabilities, and the documented history of

11

abuse in the home, this report should have triggered the most intensive investigative response possible.

55. More than 48 hours after S.W.D.R. was reported missing by his mother, an AMBER Alert was issued by the Tennessee Bureau of Investigations ("TBI"). The Sumner County Sheriff's Office ("SCSO") initiated a search that, at the beginning, involved significant resources, including community volunteers and search teams.

56. A DCS Safety Assessment was initiated on March 1, 2024, and a FAST 2.0 Assessment was completed on March 5, 2024.

57. As of the date of this Complaint, S.W.D.R.has been missing for nearly two years. He has not been found. No arrests have been made. The circumstances of his disappearance remain unknown.

58. ROGERS has been left in a state of unrelenting anguish, not knowing whether his son is alive or dead, and knowing that the state agencies entrusted with his son's protection failed him at every turn.

**E.  DCS's Own Records Demonstrate It Knew S.W.D.R. Was in Danger**

59. DCS's own records from the 2022 sexual abuse investigation (Case ID 1488410703) are critical context for understanding what DCS knew when the 2023 physical abuse investigation was opened.

60. That first investigation documented: that S.W.D.R. had been the victim of repeated sexual abuse while living in California; that he reported feeling "disgusted with himself" over what happened; that his behavioral deterioration and placement in a special behavioral program at his new school were connected to unresolved trauma symptoms; that S.W.D.R.'s therapist had identified sexually aggressive behavior and chronic bathroom accidents as direct consequences of the prior sexual abuse; and that S.W.D.R. explicitly feared that Proudfoot

12

would physically harm him if S.W.D.R. disclosed. The intake also documented that Proudfoot had already used corporal punishment on S.W.D.R. multiple times.

61. These facts form a documented foundation of S.W.D.R.'s psychological state, his vulnerabilities, and the specific danger he faced in the Proudfoot home. When the 2023 physical abuse investigation opened with allegations against that same stepfather, DCS and law enforcement carried all of this knowledge into that investigation and were on heightened notice that S.W.D.R.'s disclosures had to be assessed against everything they already knew about this child and this home.

62. The Safety Assessment dated March 1, 2024 and the FAST 2.0 Assessment dated March 5, 2024 reveal the totality of what DCS knew about S.W.D.R.'s situation prior to his disappearance, which included:

    (a) That S.W.D.R. had an IEP and Section 504 Plan;

    (b) That S.W.D.R. was diagnosed with Autism Spectrum Disorder, Severe Combined Type ADHD, and 6Q 27 Chromosome Deletion Syndrome;

    (c) That he was prescribed and taking Concerta, saw a neurologist at Vanderbilt, and was scheduled to begin ABA therapy at the time of his disappearance;

    (d) That S.W.D.R. was "sexually aggressive per his therapist's reports." Per law enforcement, "the child had some homicidal thoughts;"

    (e) That law enforcement reported that Proudfoot "had been heard by neighbors stating he hated the child and he wanted the child to die." Per the grandmother, Proudfoot "often called S.W.D.R. names and would degrade him";

    (f) That the child was missing and an amber alert was issued;

    (g) That "S.W.D.R. has been determined to meet criteria for participation in the Title IV-E Candidacy Program and is at serious or imminent risk of removal from their home."

13

This determination was made on both cases—first on September 29, 2022 (later updated to "no longer meets criteria" on May 4, 2023), and again on March 1, 2024; and

(h) That the September 29, 2022 case included a "Noncustodial Placement" need, indicating DCS recognized S.W.D.R. might need to be placed outside the home.

63. The IV-E Candidacy determination is particularly significant. Title IV-E of the Social Security Act provides federal funding for foster care. A child determined to meet IV-E Candidacy criteria is one whom the state has formally found to be "at serious or imminent risk of removal from their home." DCS made this finding about S.W.D.R.—and then left him in the very home from which it had determined he was at serious risk of being removed.

64. The combination of documented sexual abuse history, physical abuse by Proudfoot (admitted by Proudfoot himself), S.W.D.R.'s expressed fear of Proudfoot, neighbors reporting Proudfoot "hated the child and wanted the child to die," the grandmother reporting name-calling and degradation by Proudfoot, law enforcement reports of homicidal thoughts, sexually aggressive behavior, and DCS's own formal determination that S.W.D.R. was at imminent risk of removal—constituted overwhelming evidence that this child was not safe. DCS ignored all of it.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS

*Fourteenth Amendment –Deliberate Indifference and State Created Danger*

(Against All Defendants)

65. Plaintiffs incorporate by reference all preceding paragraphs as though set forth herein.

66. The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." In child welfare

cases, the applicable standard for substantive due process liability under 42 U.S.C. § 1983 is deliberate indifference. That is, whether the state actor knew of and disregarded a substantial risk of serious harm to the plaintiff. *Patel v. Kent Sch. Dist.,* 648 F.3d 965 (9th Cir. 2011).

67. Under the state-created danger doctrine, a state actor may be held liable under § 1983 when the state's affirmative actions create or increase the danger to an individual. *DeShaney v. Winnebago County Dep't of Soc. Servs.* (1989) 489 U.S. 189, 201, fn. 9.

68. S.W.D.R., as a missing child with documented disabilities and a known history of abuse, had a liberty interest in his personal security protected by the Fourteenth Amendment. ROGERS has a protected liberty interest in the care, custody, and companionship of his son.

69. This claim is brought on behalf of S.W.D.R. through his father and next friend, ROGERS. The state-created danger doctrine requires that the state's own affirmative conduct created or increased the plaintiff's exposure to danger. *Kennedy v. Ridgefield City*, 439 F.3d 1055 (9th Cir. 2006). Defendants' affirmative acts that created or increased the danger to S.W.D.R. include: (a) knowing S.W.D.R.'s history of sexual abuse that had been reported to and investigated by the DCS; (b) knowing that S.W.D.R. had a home life that DCS's own records show was marked by physical abuse, emotional degradation, and a stepfather whom neighbors reported "hated the child and wanted the child to die;" and (c) failing to take any action.

70. Defendants, acting under color of state law, were deliberately indifferent to S.W.D.R.'s disappearance. This deliberate indifference is evidenced by: (a) investigating S.W.D.R.'s home on allegations of physical abuse by Proudfoot, documenting evidence of abuse and danger, leading to a determination that S.W.D.R. was at "serious or imminent risk of removal," and then closing the case without protective action; (b) closing the investigation and thereby preventing any potential intervention or help by other entities; (c) actively

15

preventing other agencies and individuals from taking protective action by closing the case; (d) ignoring the child's own admissions of living in fear of his stepfather; (e) failing to interview ROGERS to obtain information critical to assessing S.W.D.R.'s safety, including S.W.D.R.'s expressed fear of Proudfoot, Proudfoot's ridicule of S.W.D.R. about his prior sexual abuse, and S.W.D.R.'s deteriorating mental and behavioral state; (f) the failure to follow up on statements made by the child and school administrators about his abuse; (g) the failure to follow up on statements made by the family's neighbors evidencing abuse and psychological harm; and (h) the failure to deploy resources commensurate with the known risk factors.

71. Defendants knew or should have known of the extraordinary risk factors in this case through their participation in the physical abuse investigation, their actual knowledge of S.W.D.R.'s prior documented sexual abuse and its lasting consequences, and their failure to obtain from ROGERS critical information about S.W.D.R.'s fear of Proudfoot and his deteriorating condition. Their failure to act with urgency in light of these known risks constitutes conduct that shocks the conscience.

72. As a direct and proximate result of the Defendants' deliberate indifference and affirmative acts creating danger, S.W.D.R. remains a highly at-risk missing youth.

73. Plaintiffs are entitled to compensatory damages for the continuing deprivation of S.W.D.R.'s liberty and ROGERS's familial association, punitive damages against the individual Defendants for conduct evidencing reckless or callous indifference to federally protected rights, injunctive relief directing the DCS to immediately reopen and actively prosecute the investigation with adequate resources, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

16

**SECOND CAUSE OF ACTION**

**42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS**

*Fourteenth Amendment –Special Relationship*

(Against All Defendants)

74. Plaintiffs incorporate by reference all preceding paragraphs as though set forth herein.

75. DCS's sustained involvement with S.W.D.R. through the 2023 physical abuse investigation, together with its actual knowledge of S.W.D.R.'s prior sexual abuse and its consequences carried forward from the 2022 investigation, created a special relationship giving rise to an affirmative duty to protect him. DCS conducted multiple face-to-face interviews with S.W.D.R., entered the family home on multiple occasions, convened multi-agency CPIT reviews, determined S.W.D.R. met IV-E Candidacy criteria, and exercised significant control over his welfare through its authority to remove him, provide services, or leave him in place. DCS also had an obligation, as part of that investigation, to interview ROGERS, S.W.D.R.'s other legal parent with joint physical and legal custody, whose knowledge of S.W.D.R.'s expressed fears and deteriorating condition was directly relevant to any legitimate safety assessment.

76. Having assumed this protective role and exercised authority over S.W.D.R.'s living situation, DCS had an obligation to act with reasonable care to protect him from known dangers.

77. DCS breached this duty by closing the physical abuse investigation without taking protective action despite overwhelming evidence of danger, and by failing to contact or interview ROGERS to obtain information that would have materially informed a proper safety assessment.

17

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983

*Fourteenth Amendment – Deprivation of Parental Liberty Interest*

(Against All Defendants)

78. Plaintiffs incorporate by reference all preceding paragraphs as though set forth herein.

79. Plaintiff ROGERS has a constitutionally protected liberty interest in the care, custody, and companionship of his son S.W.D.R. under the Fourteenth Amendment.

80. DCS knew that S.W.D.R. identified ROGERS as a safe parent. S.W.D.R. told BOSWELL that "he feels safe at dad's home" and identified his father by name and location. DCS documented ROGERS's contact information and confirmed he lived in Clarksville.

81. Despite knowing S.W.D.R. felt safe with his father and was being abused in his mother's home, DCS took no steps to facilitate placement with ROGERS or to alert ROGERS to the danger his son faced. DCS's deliberate indifference to these facts deprived ROGERS of his constitutionally protected interest in his son's welfare and safety.

## FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983 - FAILURE TO TRAIN AND SUPERVISE

(Against Defendants MARGIE QUIN, LESLEY KEELE RITCHIE,
AMIRA J. WALKER, and DOES 1–15)

82. Plaintiffs incorporate by reference all preceding paragraphs as though set forth herein.

83. Supervisory liability attaches under 42 U.S.C. § 1983 when a supervisor's failure to train or supervise subordinates amounts to deliberate indifference to the rights of persons those subordinates encounter. The inadequacy in training must be closely related to, and the actual cause of, the ultimate constitutional injury.

18

84. As set forth herein, Defendants' conduct violated S.W.D.R.'s constitutionally protected liberty interest in personal security under the Fourteenth Amendment, and ROGERS's protected liberty interest in the care, custody, and companionship of his son.

85. Defendants WALKER and RITCHIE, as Team Leader and Supervisor, had direct supervisory authority over the DCS investigations involving S.W.D.R.. They reviewed the case files, approved case classifications, and authorized case closures. They knew or should have known of the documented abuse, S.W.D.R.'s fear, the stepfather's admissions, and the IV-E Candidacy determination. They failed to ensure that appropriate protective action was taken.

86. Commissioner QUIN and other supervisory DOE Defendants established, maintained, or ratified policies, customs, and practices that allowed DCS caseworkers to close cases involving children at documented risk of serious harm without taking protective action, adequate follow-up, or ensuring appropriate referrals. These policies and practices were a moving force behind the constitutional violations suffered by S.W.D.R.

87. The need for such training was obvious. DCS investigating the abuse and fears of a disabled minor from a home marked by documented physical and sexual abuse, and a household member identified by neighbors as harboring lethal animosity toward the child are placed squarely in a situation where the absence of specialized training in vulnerable-victim investigations will predictably result in constitutional harm. The failure to prepare DCS officers for precisely this scenario – one that the DCS had constructive, if not actual, knowledge was likely to arise, given DCS's own participation in their proceedings concerning S.W.D.R. – constitutes deliberate indifference.

88. As a direct and proximate result of Defendants' failure to train and supervise, S.W.D.R. remains a highly at-risk missing child, and ROGERS has been deprived of his

constitutionally protected relationship with his son. Plaintiffs are entitled to compensatory damages, and injunctive relief requiring the DCS to reopen and properly resource the investigation with personnel trained in vulnerable-victim protocols, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## FIFTH CAUSE OF ACTION

### NEGLIGENCE

(Against All Defendants)

89. Plaintiffs incorporate by reference all preceding paragraphs as though set forth herein.

90. Defendants owed a duty of care to S.W.D.R. and ROGERS once they undertook to investigate S.W.D.R.'s abuse to act as a reasonably competent DCS officer or agency would when faced with similar facts.

91. The failures alleged herein are not policy-level discretionary choices but operational breakdowns in the execution of the physical abuse investigation: failing to remove S.W.D.R. from the Proudfoot home despite overwhelming evidence of danger, failing to verify conflicting statements made by parties being investigated, failing to investigate the stepfather's admitted physical discipline, failing to address S.W.D.R.'s expressed fear, failing to interview or coordinate with ROGERS to obtain information critical to assessing S.W.D.R.'s safety and to consider placement of S.W.D.R. with ROGERS during the investigation, failing to consider S.W.D.R.'s disabilities, and closing the case without adequate protective measures.

92. Once DCS undertook the investigation of S.W.D.R.'s abuse and neglect, it assumed a duty of reasonable care in conducting that investigation. Tennessee courts recognize that a duty of care arises when a defendant's conduct creates a foreseeable risk of harm to an identifiable plaintiff. The DCS had direct, documented knowledge of S.W.D.R.'s profound vulnerability,

his disabilities, and the known danger in the Proudfoot household. A reasonably competent DCS agency, knowing what the DCS knew, would have: removed S.W.D.R. from the Proudfoot home, informed Plaintiff ROGERS of the dangers DCS was made aware of, verified conflicting statements provided to them, followed up on statements from neighbors and mandatory reporters at S.W.D.R.'s school, taken S.W.D.R.'s vulnerabilities and disabilities into consideration, interviewed ROGERS as S.W.D.R.'s other legal parent with joint physical and legal custody to obtain his observations and offered S.W.D.R. placement with ROGERS during the investigation, and taken any other protective measures available before closing the investigation. The DCS did none of these things.

93. Defendants' negligent acts and omissions cumulatively amount to willful, malicious, or grossly negligent conduct. These actions constitute a conscious indifference to the consequences when a reasonable person would have recognized that the conduct was likely to harm another. The conduct described herein rises to this standard.

94. Defendants breached their duty through the acts and omissions described herein, which constituted gross negligence and a conscious disregard for S.W.D.R.'s safety and ROGERS's rights as a parent.

95. As a direct and proximate result of Defendants' negligence and gross negligence, S.W.D.R. remains a missing at-risk child, and ROGERS has suffered substantial, ongoing harm including the loss of his son's companionship and the severe emotional injury of not knowing whether S.W.D.R. is alive or dead.

96. Plaintiffs are entitled to compensatory damages from the governmental entity defendants to the extent permitted by the Tennessee Governmental Tort Liability Act ("TGTLA"), and to compensatory and punitive damages from the individual defendants in their individual capacities for their grossly negligent and willful failures.

## SIXTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(Against All Defendants)

97. Plaintiffs incorporate by reference all preceding paragraphs as though set forth herein.

98. Tennessee recognizes a claim for intentional infliction of emotional distress where the plaintiff proves: (1) the defendant's conduct was intentional or reckless; (2) the conduct was so outrageous that it is not tolerated by civilized society; and (3) the conduct resulted in serious mental injury to the plaintiff. *Lemon v. Williamson Cty. Sch.*, 618 S.W.3d 1 (Tenn. 2021); *Leach v. Taylor*, 124 S.W.3d 87 (Tenn. 2004).

99. The facts support a finding that Defendants' conduct was reckless and intentional. DCS consciously ignored S.W.D.R.'s documented abuse, disabilities, vulnerabilities, and the stepfather's documented animosity towards the child, and S.W.D.R.'s fear of him. RITCHIE, WALKER and QUIN, as the final policymakers with direct supervisory authority, made deliberate choices to end the investigations without protective action, to leave S.W.D.R. biological father in the dark, and to leave a disabled child in a potentially dangerous home. These were not inadvertent omissions, but affirmative choices made with conscious disregard of their effect on S.W.D.R. and ROGERS.

100. Defendants conduct meets and exceeds the outrageousness threshold. Defendants are law enforcement officials with exclusive authority over the only official investigation into S.W.D.R.'s pre-disappearance abuse and neglect. Their abuse of that exclusive authority to effectively abandon a profoundly disabled child's case, while maintaining a monopoly over the investigations that prevents ROGERS from seeking redress elsewhere, is outrageous. The conduct alleged is beyond what any reasonable person in a civilized society should be required to endure from those entrusted with the duty to protect his child.

22

101. As a direct and proximate result of Defendant's intentional or reckless outrageous conduct, ROGERS has suffered serious mental injury that no reasonable person would be expected to endure: the prolonged, unresolved disappearance of his disabled teenage son, combined with the law enforcement agency responsible for finding that son going completely silent for nearly two years. This is not the transient distress of an ordinary grievance. It is a sustained, open-ended mental anguish, including the inability to grieve, plan, or act, because the whereabouts and fate of his child remain unknown and the agency that could answer that question has chosen silence.

102. This cause of action is asserted against Defendants RITCHIE, QUIN, and WALKER in their individual capacities, for their personal intentional or reckless outrageous conduct as described herein. Punitive damages are sought against the individual Defendants in their individual capacities.

103. As a direct and proximate result of Defendants' intentional and reckless outrageous conduct, ROGERS has suffered, and continues to suffer, severe emotional distress entitling him to compensatory and punitive damages in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

1. Compensatory damages in an amount to be proven at trial but not less than FIFTEEN MILLION DOLLARS ($15,000,000.00);

2. Punitive damages against the individual Defendants;

3. Injunctive relief requiring the DCS to reopen active investigation of S.W.D.R.'s case with adequate resources, and implement mandatory communication requirements with children's families when their wellbeing is being investigated;

4. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

5. Pre-judgment and post-judgment interest; and

6. Such other and further relief as this Court deems just and equitable.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated:  July 16, 2026

**DRE, A.P.C.**

Darren M. Richie, Esq. (CA SBN 316116)
*Attorney for Plaintiffs, Seth Rogers and S.D.W.R.*
DRE, A.P.C.
1641 Mallory Lane Suite 100
Brentwood, TN 37027
(213) 265-7888
Darren@drelaw.com

CERTIFICATION OF SERVICE

I certify that Plaintiff's COMPLAINT AND JURY DEMAND has been served upon the following parties and counsel of record by electronic mail, electronic filing, and/pr by depositing a copy thereof in the United States mail, properly addressed and postage-paid.


SERVICE LIST:

Tennessee Department of Children's Services
UBS Tower, 10th Floor
315 Deaderick Street
Nashville, TN 37238

Margie Quin
Commissioner of Tennessee Department of Children's Services
UBS Tower, 10th Floor
315 Deaderick Street
Nashville, TN 37238

Lesley Keele Ritchie
Tennessee Department of Children's Services
UBS Tower, 10th Floor
315 Deaderick Street
Nashville, TN 37238

Laura Boswell
Tennessee Department of Children's Services
UBS Tower, 10th Floor
315 Deaderick Street
Nashville, TN 37238

Amira J. Walker
Tennessee Department of Children's Services
UBS Tower, 10th Floor
315 Deaderick Street
Nashville, TN 37238


_____
DARREN M. RICHIE, ESQ.

25